[Cite as *In re T.T.*, 2018-Ohio-2920.]

STATE OF OHIO       )           IN THE COURT OF APPEALS
                      )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

IN RE: T.T.                             C.A. No.      28995

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 17-06-000483

DECISION AND JOURNAL ENTRY

Dated: July 25, 2018

CARR, Presiding Judge.

**{¶1}** Appellant, L.M. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights and placed his minor child in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

**{¶2}** Father and Mother are the biological parents of T.T., born February 2, 2004. Although both parents have other children, only T.T. is a party to this appeal. Mother voluntarily relinquished her parental rights and did not appeal from the trial court's judgment.

**{¶3}** T.T. has a history with CSB dating back to 2009 because of drug use and violence in the homes of Father and Mother and the child's serious mental health and behavioral problems. CSB filed the 2009 case after a drug-related robbery in Father's home, during which then five-year-old T.T. witnessed Father being shot in the chest. CSB's initial complaint

requested that T.T. be permitted to stay in Mother's home, provided she prevented him from having contact with Father, who had a long history of substance abuse and criminal activity. Because Mother continued to allow Father to have contact with T.T., the child was removed from Mother's home a few days later. T.T. was adjudicated a dependent child and placed in the temporary custody of CSB. During June 2010, T.T. was returned to the custody of Mother under an order of protective supervision. Protective supervision was terminated on October 5, 2010.

{¶4} Less than one month later, however, CSB filed another complaint to allege that T.T. was a dependent child because Mother was exposing him to ongoing violence and drug activity. T.T. was adjudicated dependent and placed in the temporary custody of the maternal grandmother under an order of protective supervision. During that case, Mother made minimal progress on the case plan. T.T. was eventually placed in the legal custody of the maternal grandparents and that case was closed.

{¶5} On September 20, 2012, CSB filed a third complaint, alleging that T.T. was an abused and dependent child. T.T. was removed from the custody of the grandparents pursuant to Juv.R. 6 because he disclosed to school personnel that he had been physically abused by a relative. Pursuant to an agreement between the parties, the allegations of abuse were dismissed and T.T. was adjudicated a dependent child. He was placed in the temporary custody of CSB and, although the grandparents had been reluctant to continue caring for him because of his mental health and behavioral problems, T.T. was returned to their legal custody during August 2013.

{¶6} Several months later, Mother moved for legal custody of T.T., alleging that the grandparents were no longer willing to care for the child. T.T. was returned to Mother's legal custody on July 28, 2014.

{¶7} On January 7, 2015, CSB filed a complaint to allege that T.T. was an abused, neglected, and dependent child because he had been the victim of physical abuse by Mother's then-husband, Henry, and had been exposed to ongoing domestic violence between Mother and Henry. T.T. was adjudicated an abused, neglected, and dependent child and placed in the temporary custody of CSB. Mother substantially complied with the reunification goals of the case plan in that case and, during May 2017, T.T. was released from a residential mental health treatment facility and returned to Mother's custody under an order of protective supervision.

{¶8} Shortly afterward, police were called to Mother's home because T.T. was throwing rocks at cars and had threatened to harm himself or Mother when she confronted him about it. CSB filed the complaint in this case, seeking custody of T.T. and alleging that he was a dependent child. The complaint alleged that Mother was not willing and able to provide appropriate care for T.T., who continued to suffer from serious mental health and behavioral problems and posed a risk to the safety of himself and others living in the home. T.T. was later adjudicated a dependent child and placed in the temporary custody of CSB.

{¶9} Throughout this and the prior cases, Father had little contact with T.T. or CSB and did not work toward reunification with the child. Father was convicted and incarcerated repeatedly for numerous violent crimes and felony drug offenses. T.T. also spent a significant amount of time in residential detention or treatment facilities for his mental health and behavioral problems. During some of T.T.'s time in those facilities, he was not permitted to have visitors or receive phone calls. When Father was able to have contact with T.T., he did not make much effort to do so. After his most recent period of incarceration, however, Father approached CSB and expressed interest in reunifying with T.T.

{¶10} On October 26, 2017, CSB moved for permanent custody of T.T. Mother voluntarily relinquished her parental rights to the child. Father alternatively requested legal custody of T.T. or a six-month extension of temporary custody. Following a hearing on the competing dispositional motions, the trial court terminated Father's parental rights and placed T.T. in the permanent custody of CSB. Father appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED FATHER'S PARENTAL RIGHTS AS THE EVIDENCE WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶11} Father's sole assignment of error is that the trial court's permanent custody decision was not supported by the evidence presented at the hearing. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child in a parent's custody has been adjudicated abused, neglected, or dependent on three separate occasions; or the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶12} The trial court found that CSB satisfied the first prong of the permanent custody test for several alternative reasons, including that Father abandoned T.T., T.T. had been in the

temporary custody of CSB for at least 12 months of a consecutive 22-month period, and he had been adjudicated an abused, neglected, or dependent child on at least three separate occasions. *See* R.C. 2151.414(E)(10) and 2151.414(B)(1)(d) and (e). Father concedes that CSB satisfied the first prong of the test under R.C. 2151.414(B)(1)(e), because T.T. had been adjudicated an abused, neglected, and/or dependent child on five separate occasions. Father also agrees that, because that ground was properly proven, he suffered no prejudice by any error in the trial court's alternative first prong findings. *See, e.g.*, *In re S.C.*, 9th Dist. Summit No. 27676, 2015-Ohio-2623, ¶ 30.

{¶13} Father challenges the trial court's conclusion that permanent custody was in the best interest of T.T. His primary argument on appeal is that he was not given enough time to work on the reunification goals of the case plan and that the trial court erred in considering requirements that were not on the case plan. Although the case plan in this case was not in effect for long, throughout several juvenile cases dating back to 2009, the case plan goals for Father have consistently focused on his problems with drugs, violence, and criminal activity. The case plans have required Father to resolve his criminal, substance abuse, and domestic violence problems, including that he comply with all the conditions of his probation, which he has failed to do. As this Court has emphasized numerous times, case plan compliance is relevant but is not dispositive of the best interest of the child. *See*, *e.g.*, *In re G.L.S.*, 9th Dist. Summit Nos. 28847, 28893, 2018-Ohio-1606, ¶ 20.

{¶14} When determining the child's best interest under R.C. 2151.414(D), the juvenile court must consider all relevant factors, including the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the need for permanence in the child's

life, and whether any of the factors set forth in R.C. 2151.414(E)(7) to (11) apply to the facts of the case. *See In re R.G.,* 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11.

{¶15} Of relevance here, the trial court found that Father had abandoned T.T. under R.C. 2151.414(E)(10). Father argues that CSB failed to present sufficient evidence that he abandoned T.T. because he was restricted from visiting T.T. and continued to have occasional telephone contact with the child. Even if a finding of abandonment was not appropriate in this case, Father has failed to demonstrate that he suffered any prejudice. The trial court did not emphasize the abandonment finding in its best interest analysis. Moreover, Father does not contest the trial court's findings on any of the other best interest factors, which overwhelmingly supported the trial court's decision.

{¶16} The trial court's conclusions on the best interest factors were supported by the undisputed evidence. Significantly, regardless of whether it was the fault of Father or the parties' circumstances, Father had minimal interaction with T.T. since CSB opened its first case with the child in 2009. Beginning in 2000, Father has been repeatedly convicted and incarcerated for extended periods, and was again incarcerated for nearly three years before the final hearing for crimes that included possession of heroin. During those incarcerations, he had little or no contact with CSB or T.T. and made no effort to reunify with his child.

{¶17} After Father was released from his most recent incarceration during the late summer of 2017, he was assessed for his risk of reoffending. According to his probation officer, Father's risk of reoffending was extremely high, which warranted close monitoring. Even under close monitoring, Father was only "loosely compliant" with required drug treatment, continued to test positive for drugs, and did not regularly report to his probation officer.

{¶18} In addition to Father's need to address his own problems, several witnesses testified that Father lacked the ability to appropriately address T.T.'s serious mental health and behavioral problems. T.T. was first hospitalized for psychiatric treatment at the age of six. By the age of 11, he had attempted suicide six times. Because T.T. has repeatedly harmed himself, or threatened or attempted self-harm or harm to others, he has been in and out of detention centers and mental health treatment facilities for most of the past eight years. His mental health diagnoses have changed over the years and mental health professionals were still adjusting his psychiatric medications to control his extreme anxiety and depression. Because T.T. was almost six feet tall and 199 pounds, it had become difficult to control his behavioral outbursts in a regular home setting, so he had been residing primarily in therapeutic foster homes or residential treatment facilities.

{¶19} The evidence before the court was not disputed that T.T. would continue to require ongoing and intensive mental health treatment for the foreseeable future. T.T. was in need of a stable caregiver who understood the severity of his problems and would ensure that he received appropriate supervision and treatment. Father lacked stability and did not understand the severity of T.T.'s mental health and behavioral problems. He had often blamed the child's problems on Mother and expressed his belief that the child would have no problems if he lived with Father.

{¶20} T.T. had expressed a desire to live with Father, but Father was unable to provide him with the stability that he needed. Furthermore, the caseworker explained that T.T. was an "emotionally fragile" child, who was devastated that Mother had given up on him, and desperately wanted a family to love him. During the months before the hearing, T.T. was able to make phone calls to Father and the caseworker encouraged him to do so, but T.T. did not want to

call Father. T.T. told the caseworker and the guardian ad litem that he was tired of Father lying to him about his drug use and criminal activity and that he did not believe that Father would ever change. The guardian ad litem believed that permanent custody was in the best interest of T.T. She emphasized that Father had done little to work toward reunification during the past nine years and opined that T.T. needed to move forward with his life and stop being disappointed by Father.

{¶21} By the time of the hearing, 14-year-old T.T. had been moving in and out of temporary placements for more than nine years and was in need of a legally secure permanent placement. Mother did not want to provide him with a stable home, Father was not able to do so, and CSB had found no other suitable relatives to provide T.T. with a permanent home. The trial court reasonably concluded that permanent custody was in the best interest of T.T. Father's assignment of error is overruled.

## III.

{¶22} Father's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

SCHAFER, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

NEIL P. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.

RONALD GATTS, Attorney at Law, for Mother.

SALLY PRENTICE, Attorney at Law, for Child.

HOLLY FARAH, Guardian ad Litem.